## Elizabeth Whalin, Admx., v. Illinois Central Railroad Company.

1. COUPLING CARS—*when servant injured while, is not entitled to recover.* A foreman of a switching crew injured while in the act of coupling cars is not entitled to recover from his employer where in order to do such coupling he went between the cars without order from his master and acted entirely upon his own judgment and discretion.

2. AUTOMATIC COUPLERS—*construction of federal statute requiring.* In this case the court, by way of dicta, says concerning the federal statute requiring the equipment of cars with automatic couplers: " We think it would be a strained construction of the statute, far beyond the contemplation and purpose of Congress in the enactment, to hold that under no circumstance or condition of convenience or necessity, cars duly equipped with automatic couplers required by the act, may not be temporarily linked or coupled by special device."

Action on the case for personal injuries. Error to the Circuit Court of Massac County; the Hon. ALONZO K. VICKERS, Judge, presiding. Heard in this court at the August term, 1903. Affirmed. Opinion filed March 10, 1904.

Fred R. Young and C. L. V. Mulkey, for plaintiff in error.

W. W. Barr and Courtney & Helm, for defendant in error; J. M. Dickinson, of counsel.

Mr. Justice Myers delivered the opinion of the court.

The issues made in this court upon the record submitted requiring consideration of all the evidence, the facts need to be stated more fully than would otherwise be necessary.

April 1, 1902, John D: Whalin was killed while engaged in coupling cars in the switchyard of the defendant at Brookport, Illinois.` He was foreman of one of two switching crews that worked in the yard. Each crew operated with an engine and was composed of five persons: engineer, fireman, foreman and two switchmen. The duties of the two crews in switching cars, making up trains, and moving cars and trains from the main track and switchyard to a boat for transfer across the Ohio river, were, it seems, identical and interchangeable. In general the crews worked and co-operated indiscriminately in the business of the yard. Sometimes one crew would operate in the east end of the yard, moving the freight cars to the transfer boat, while the other would handle the passenger coaches from the west end, and the next day the crews would be posted in reverse order. In transferring a mixed train across the river, as in this instance, the freight cars toward the east were first to be placed on the transfer boat by means of a curve track or switch on the east side, connecting with the inclined track from the bank to the river. After the freight cars were in place on the boat, the passenger coaches were, in like manner, brought to the boat, by means of a similar curved track on the west side of the yard. The work of the switching crews was under the supervision and direction of a yardmaster. On the morning of the injury a mixed train, consisting of a number of freight cars and two passenger coaches at the rear end, one a sleeper and the other a baggage and passenger car combined, came into the yard and was to be transferred by boat to the opposite

side of the river.    Whalin with an engine and crew, was in
the west end of the yard, and to him fell the duty of mov-
ing the passenger coaches to the boat.    The other crew was
in the yard to the east.    It was to handle the freight cars.
The cars were equipped with automatic couplers, but in
order to move the passenger cars over the switch and down
the incline to the boat without injury to the cars, a tempo-
rary special coupling appliance was necessary and provided.
This consisted of a solid bar of iron twelve or fourteen
inches long, five inches wide, and one and one-fourth inches
thick, with a hole in each end for the pins in the draw-bars
at the ends of the cars.    In loading passenger cars aboard
the boat, this bar was substituted for the automatic coupler.
To make the coupling with this appliance, preparatory of
the movement of the passenger cars, it was necessary for
the switchman to go between the ends of the two cars
about to be coupled.

On the morning in question, Whalin with his engine and
crew were at the east end of the yard, presumably in wait-
ing for the train which came in and stopped in the yard on
the main track running east and west.    Immediately, and
before the freight cars had been uncoupled from the pas-
senger coaches, he went between the baggage car and the
coach to adjust the bar and make the coupling preparatory
of the movement described.    While between the cars, and
thus engaged, they were forced together by a movement of
the train from the west end and Whalin was killed.    At
the time Whalin was between the cars, the other crew and
engineer were at the east end of the yard preparing to
move the freight cars to the boat.

Suit was brought in the Circuit Court of Massac County
by Elizabeth Whalin, plaintiff in error, as administratrix,
against the I. C. R. R. Co., defendant in error, for damages,
on the charge of negligence, alleged to have caused the
death of plaintiff's intestate.    In the trial of the case, at
the conclusion of the plaintiff's evidence, the court, on motion
of defendant, instructed the jury to find the defendant not
guilty, and by their verdict the jury found accordingly.

Judgment was entered thereon against the plaintiff, by whom the case is brought to this court by writ of error.

The declaration contains three counts. By the first the defendant is charged with negligence in failing to provide proper and adequate rules for the conduct of its business in the switchyard at Brookport. By the second, the defendant is charged with negligence in permitting the crew at the east end of the yard to back their engine against the freight cars, thereby causing the collision and injury. The third count is based upon an alleged violation of the Federal Statute requiring the use of automatic couplers by carriers engaged in interstate commerce, and charges negligence and failure to provide automatic coupling for cars that were not so equipped.

Is there any evidence in this record which, fairly interpreted, tends to prove the negligence set out in any one or more of the counts of plaintiff's declaration ? This is the sole question made by the court's instruction to the jury, and to this we give consideration. If there was such evidence, it was the plaintiff's right to have the same submitted to the jury, and the court should have refused the peremptory instruction; otherwise the instruction was proper and the court justified in giving it.

Neither by allegation nor proof does it appear that plaintiff's intestate came to his death for want of proper and adequate rules and regulations for the conduct of the business in and about the switchyard. The rule contended for in argument, that the co-operating switch crew should have been prohibited from working at the other end of the train *after Whalin was ordered* by his superior to attach his engine to the west end of the train, amounts to no more than a requirement of the employees not to do that which will endanger a co-employee or fellow-servant. This is an implied obligation resting alike upon master and servant and requires no formal statement as a rule to give it force. There is no evidence whatever that deceased was ordered by his superior to attach his engine to the west end of the train, nor is there any evidence that the other crew was working at the other end. It is not shown by what means

or by whose act, whether that of the train crew or the switching crew, the cars were moved against the deceased. It does not even appear that the train engine had been uncoupled. In this state of the evidence the court was fully warranted in its ruling as to the first count.

Likewise, as to the second count. There is a total lack of evidence to support the charge of negligence. The deceased and White, the foreman of the other switching crew, were engaged in their regular and usual duties and occupation under the general supervision of Durham, the yard-master. Deceased was the directing authority of his crew in the work and operation of loading the cars aboard the boat. He acted entirely within his own judgment and discretion, uninfluenced by the presence or direct orders of his superior, the yardmaster. At most, he was acting only under a general order or assignment to service with which he was familiar from long experience, and the manner of performance was within his ordinary duties, for which, it may be assumed, he possessed the requisite skill. No one more than deceased, knew or had opportunity to know and appreciate the risk in going between the cars, at the time and under the circumstances shown in this case. The danger was incidental to the business, and so clearly apparent, even to a novice, that voluntary exposure would bar the right of recovery. The rule that recovery may be had where an employee or servant is injured while acting in obedience to the order of his superior has no application under the facts in this case. The deceased was not ordered to make the coupling, go between the cars, or in any special manner directed by Durham the yardmaster. Durham was not near, and there is no proof that he gave any orders, general or special, relating to the particular work in which the deceased was engaged when he met his death. To permit a thing to be done, (the charge of negligence in the second count, implies prior knowledge of the act and the power to prohibit,) to be negligence in Durham, whereby the defendant may be held to liability, his presence or direct permission to the crew at the east end of the yard to back the engine and cars, would be necessary to support this

allegation. There is no evidence tending to prove either circumstance. He was not present and may not be held to have permitted the act complained of. And as stated in discussing the first count, there is no proof that the east end crew in fact moved the cars.

The proof that the cars were equipped with automatic couplers, as required by the Federal Statute, is clear, positive and without the slightest discrepancy of testimony. In such state of the evidence we are unable to appreciate the plaintiff's contention or understand the application of the authorities cited in support. The charge in the declaration is, that the cars were not equipped with automatic couplers. The undisputed proof is that they were so equipped. It is argued that the couplers provided were not used, but purposely, and it may be added, necessarily, dispensed with. This however is not the complaint, and if it were, we think it would be a strained construction of the statute, far beyond the contemplation and purpose of Congress in the enactment, to hold that under no circumstance or condition of convenience or necessity, cars duly equipped with automatic couplers required by the act, may not be temporarily linked or coupled by special device. Were this the meaning of the law, it would be impossible to remove broken cars from a wreck, or transport them with defective couplers to the repair shop, or on other occasion, when required for the greater security of person or property, to substitute a special device or coupler, as in this case. We are not inclined to this construction of the statute in question, and besides, it is not called for under the pleading and evidence in this case.

The law is rightfully exacting of employers and holds them to a high degree of care for the safety of employees, and in a proper case the courts will not hesitate to impose liability. But employer, no less than employee, is entitled to the protection of the law. In this case there was not evidence to support the complaint, and it was the duty of the court to give the peremptory instruction.

*Affirmed.*